IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SKALSKY V. SKALSKY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MELISSA M. SKALSKY, APPELLANT AND CROSS-APPELLEE,

V.

JOHN J. SKALSKY, APPELLEE AND CROSS-APPELLANT.

Filed July 17, 2018.    No. A-17-680.

Appeal from the District Court for Keith County: RICHARD A. BIRCH, Judge. Affirmed.

Felicia K. Fair, of Fair Law Office, P.C., L.L.O., for appellant.

P. Stephen Potter for appellee.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Melissa M. Skalsky appeals and John J. Skalsky cross-appeals from the order of the district court for Keith County which denied their requests to modify the parties' decree of dissolution. John sought modification of the awards of alimony and child support; Melissa sought modification of custody and parenting time. On appeal, the parties challenge the denial of their requests for modification. Melissa also asserts that the court erroneously relied on ex parte evidence related to the issues in this case. For the reasons set forth herein, we affirm.

### BACKGROUND

Melissa and John were married in 1995. They have three children: Saige, born in 1999; Hunter, born in 2002; and Ethan, born in 2005. Following a contested trial with respect to issues other than division of the marital estate, the district court entered a decree of dissolution on August 6, 2015. The court awarded custody of the parties' minor children to John, subject to Melissa's

- 1 -

parenting time set forth in the attached parenting plan. Melissa was provided with parenting time every other week from Thursday through Sunday, as well as a period during the summer and on specified holidays. The court ordered Melissa to pay John child support of $230 per month for three children and for two children (a deviation from the Nebraska Child Support Guidelines based on the basic subsistence limitation set forth in Neb. Ct. R. § 4-218 (rev. 2015)), and $224 per month for one child. The court ordered John to pay Melissa alimony of $950 per month for 60 months and then $600 per month for an additional 48 months. Melissa appealed, and this court modified the decree to eliminate a residential boundary imposed by the district court as a condition on parenting time but affirmed all other provisions of the decree. See *Skalsky v. Skalsky*, No. A-15-973, 2016 WL 4529597 (Neb. App. Aug. 30, 2016) (selected for posting to court website).

On October 10, 2016, John filed a complaint to modify. He alleged that since the decree, there had been a material change in circumstances affecting the children's best interests. Specifically, he alleged that Melissa's financial condition had improved after she moved in with her boyfriend. John alleged that the change justified modification of Melissa's child support obligation and modification or termination of the award of alimony.

Melissa filed an "Answer and Counter Complaint," seeking to modify custody and parenting time. She alleged a material change in circumstances based on John's interference with her relationship with the children, and sought legal and physical custody of the children, subject to John's regular parenting time.

On May 16, 2017, John filed a motion, seeking to suspend Melissa's parenting time with the parties' youngest child, Ethan, "during the pendency of this matter." John alleged that Melissa had attempted to alienate Ethan by involving him in custody and visitation issues.

Trial was held before the district court on May 17, 2017. The court heard in camera testimony from the three children and testimony from the parties and various witnesses. The court received exhibits, including copies of text messages between the parties, a recording of two telephone conversations between Ethan and Melissa, Melissa's 2015 and 2016 income tax returns, and other financial documents.

At the time of the modification hearing, Saige was 17 years old and a junior year in high school. She is getting good grades and is involved in various extracurricular activities. She testified that "things" were "pretty good" with John and that she would prefer to have him retain custody of her. She indicated that "things" were "fine for [her]" when she did not have to visit Melissa. The last time Saige visited Melissa was Thanksgiving 2016. According to Saige, she and Melissa do not talk and they fight if they do talk. She stated further that she feels uncomfortable and unhappy when visiting Melissa and that they "don't get along." Saige was unsure what could be done to improve her relationship with Melissa. Saige felt like they had tried to improve their relationship and had gone to counseling but that their relationship "just doesn't work." When asked if there was anything Melissa could do to improve their relationship, Saige stated it would be easier to try to get along with Melissa if she would stop "picking fights" with John. Saige described a recent incident when Melissa tried to "pick a fight" with John at Ethan's choir concert, which Saige found embarrassing. Saige indicated that she ignores Melissa in public at times and described other incidents of conflict that we do not detail here. When asked why she "hate[s]" Melissa so much,

Saige responded that Melissa had cheated on John and had always treated Saige poorly. Saige testified that John tells her she has to go to Melissa's but that she is not punished for not going.

Hunter was 15 years old at the time of the hearing and in the ninth grade. He testified that school had been going well and that he had been participating in various sports activities. Hunter testified that he was getting along with both of his parents and that no changes were needed with respect to his custody; he expressed a preference for living with John. With respect to Melissa's parenting time, Hunter does not spend "full parenting time weekends" with Melissa. He stated that he "just go[es] over there on weekends whenever [he] can" and agreed that they were "just kind of working it out as [they] go along." Hunter testified that he usually spends a couple of hours at Melissa's on Sundays. Hunter stays in touch with Melissa by phone and text message. He indicated that John encourages the children to go to Melissa's house, but he agreed that John does not punish them when they do not go. Hunter stated that he prefers living at his father's house because he thinks "it's just boring over there" at Melissa's house. He also stated that he liked being around John more than Melissa. He did indicate that he tries to get along with Melissa's boyfriend.

Hunter confirmed that Saige does not like or talk to Melissa. Hunter stated that Ethan will be in a "bad mood" and "crabby" when returning from parenting time with Melissa but that he is usually "just fine" after a couple of days. Hunter agreed that Ethan's mood upon returning from Melissa's is probably due to him wanting to stay longer.

Ethan was 12 years old at the time of the hearing and in the sixth grade. He has participated in sports and other activities. He indicated that school was going "good." According to Ethan, he sees Melissa regularly according to the parenting time schedule, and he stated that their visits are "going really well." He testified that he has good visits with Melissa even if Saige and Hunter are not there, although he admitted to telling Melissa that he would miss his siblings if he spent more time with her. Ethan stated that he does not like the current parenting time schedule because he does not get to see Melissa as much. Ethan stated that he would like to be able to spend equal amounts of time with both parents. He testified that he sometimes calls or texts Melissa in the middle of the night because he misses her and wants to talk to her. He stated that "things" are "okay" when he is at John's, such as when he gets "to go to the lake and have fun." At other times, "things don't go okay," such as when he does not "get out of bed in the morning and sometimes going to bed." According to Ethan, John does not discourage him from spending time with Melissa and sometimes lets him spend extra time at Melissa's.

According to John, he has always told the children that they need to exercise their scheduled parenting time with Melissa and that if they have something else they want to do or any disagreement, they need to work it out with her. He testified that he has talked to Saige about going to Melissa's but that Saige "puts her foot down and is adamant" about not going. John noted that Melissa's requests for additional parenting time frequently are made "the day of" when they already have something else planned, but he testified that he gives Melissa more extra parenting time than Melissa was "giving [him] credit for." He testified to various recent occasions when Melissa has asked for additional time to see the children, and he has agreed to the extra time. John also noted that Melissa gets Ethan several hours early "on every Thursday" of her parenting time.

John thinks it is important that the children have a good relationship with Melissa. When asked about the issues between Saige and Melissa, John testified that he thought Saige did not feel

that Melissa respected her. John noted that Hunter is very active, involved in sports, and not home very much. He agreed that Ethan seemed to have the closest relationship with Melissa of the three children, but he expressed concern that "there's some pressure being put on him." John also expressed concern about conflicts Melissa had with him and those around him in the children's presence when interacting with him in person. John testified that the children were "close" and that he thought it was important for them to remain together. He did not think custody should be changed because "[t]he kids are successful, things are going well."

Melissa asked the district court to give her custody of Ethan and Hunter. She testified that while she would love to have custody of all three children, she knows that "Saige will not go." When asked if it was in the boys' best interests to separate them from Saige, Melissa noted that they would be separated in a year regardless because Saige would be graduating from high school. She testified that she would be "very lenient and liberal" in visitations with John if the court granted her request. When asked what circumstances had changed since the time of the parties' divorce, Melissa testified:

> [Saige] has come to hate me, . . . Hunter and I's relationship has been a roller coaster due to things that he sees on both sides. He's come to me with things that he has heard his dad and friends say that concern him and hurt him.
>
> Hunter and I have become extremely close in the last couple months. Ethan, that little boy needs his mom.

Melissa testified about Ethan's emotional phone calls to her in the middle of the night, several of which Melissa has recorded. She agreed that she told Ethan she wished he could spend more time with her, but she denied attempting to alienate Ethan and the other children from John. Melissa indicated that for a period of time after the decree, all three children spent parenting time with her pursuant to the schedule. Melissa confirmed that Saige stopped coming to her house at the end of 2015 and testified that Hunter's last overnight stay was at the end of May 2016. She indicated that Saige did not explain why she stopped coming. Melissa blamed the hostility between her and Saige on John, testifying that she and Saige were not having relationship problems before the divorce. Melissa connected Hunter's decreased visitation with receipt of a vehicle from John. She testified, however, that "for the most part," she and Hunter did not have any relationship problems. She testified that although she has requested extra time with Ethan, John has only granted her one extra overnight and that there usually has to be "a trade-off" of time for John.

Melissa and her boyfriend purchased a house as joint tenants in May 2016, and both of their names are on the mortgage for the property. The boyfriend has lived in the residence since August 2014. Melissa moved into the residence in October 2015, at which time the boyfriend was renting the property. Melissa began paying part of the rent when she moved in. According to the boyfriend, they split rent payments and utilities equally at that time. The boyfriend made a $25,000 payment on the house before Melissa moved in and an additional downpayment of $9,000 at the time of purchase. Melissa did not pay any of the downpayment. The loan on the house was $122,000.

After purchasing the house, Melissa and her boyfriend opened a joint checking account to pay the mortgage and utilities, each contributing what they "make" to the account. The payments

Melissa receives for alimony go into her personal account rather than the joint account; she also makes her child support payments out of her personal account. Her monthly contribution to the joint account varies based on "what she can afford to . . . put in there." They also pay the bill for various family cellphones and certain other bills from the joint account. Melissa pays other personal bills, such as her vehicle payment, from her personal account. Melissa's boyfriend agreed that he contributes the majority of the funds to the joint checking account.

Melissa's testimony about the purchase of the house and her contributions to their shared expenses was consistent with her boyfriend's testimony. She characterized her financial situation since moving in with her boyfriend as "about the same" as it was previously and testified that she is still in need of the additional income she receives from alimony. Melissa's individual income tax returns show that in 2015 she received alimony of $4,750 and business income of $15,537 for a total income of $20,287 and that in 2016 she received alimony of $11,400 and business income of $9,595 for a total income of $20,995. The CPA who prepared Melissa's tax returns testified that her 2015 return did not accurately reflect her "booth rent" of $2,700 and that it would have to be amended to reflect a lower amount of income.

On June 2, 2017, the district court entered an order denying the parties' requests for modification. In addressing John's complaint, the court first found that since the decree, Melissa had continued to work at the same job and had not had an increase in her income or earning capacity. The court concluded that under the Nebraska Child Support Guidelines, Melissa's residence with her boyfriend did not provide a basis for modifying child support. The court observed that while cohabitation could provide a basis for modifying or terminating an award of alimony, it must be accompanied by an improvement in the financial condition of the recipient. The court declined to modify or terminate the award of alimony, stating:

> Undoubtedly, [Melissa's] current living arrangements allow her to maintain a higher standard of living than would be possible if she was paying all of her own expenses. However, [Melissa's] earned income, which has not increased since the divorce, is not sufficient to cover her living expenses. The financial condition of [Melissa] has not improved as a result of her cohabitation. All of her income was necessary to pay her living expenses prior to the cohabitation, and all of it is needed to pay those expenses at this time.

The court found that there had not been an improvement of Melissa's financial condition as a result of her cohabitation and that John had failed to establish a material change in circumstances that would justify reducing or terminating his alimony obligation.

In addressing Melissa's claims, the district court first noted that while Melissa sought custody of all three children in her "Counter Complaint," she "recognizes, at this time it is not an option with Saige." The court also noted that Melissa's relationship with Hunter "has been a rollercoaster." The court found that it was not in the children's best interests to split their custody and that Melissa's belief that since the divorce "[John] caused her problems with Saige, and Saige caused her problems with Hunter" was not supported by the evidence. The court stated, "[Melissa] is correct in her assertion that [John] could be more encouraging and accommodating regarding her visitation with the children. To her credit, [Melissa] has been very flexible in how she has dealt with visitation problems with Saige and Hunter. Ethan, in particular, would benefit from [John]

showing similar flexibility." After reviewing the text message exhibit, the court stated, "Despite the obvious anger and aggravation reflected in large portions of [the exhibit], portions that reflect poorly on each party, they have been able to communicate and coordinate numerous matters involving their children. That is very positive." The court concluded that Melissa had not shown a material change in circumstances since entry of the decree affecting the children's best interests, which would justify a change in custody. Accordingly, the court denied Melissa's "Counter Complaint."

Finally, the district court denied John's motion to suspend Melissa's parenting time with Ethan.

On June 30, 2017, Melissa filed a motion to vacate the district court's order of June 2. She alleged that on June 29, she learned that a petition and affidavit to obtain a harassment protection order had been filed in the district court against her by John's girlfriend just days before the modification trial in May. She alleged that the girlfriend's affidavit included information about John, Melissa, the parties' children, and the girlfriend, which was directly related to the evidence presented at the modification trial. Melissa alleged that the petition and affidavit for a harassment protection order were reviewed by the court on May 15, 2 days prior to the modification trial and that the petition was dismissed by the court on May 16. Melissa alleged that although she was the named respondent, she was never served with the petition for harassment protection order or the order dismissing the petition, and thus, she had no notice of the filing or any reason to know of the filing. She also noted that neither she nor John called John's girlfriend as a witness during the modification trial. Melissa alleged that the district court did not disclose, either before the modification trial or at any time prior to entry of the June 2 order, that "it considered - ex parte - other evidence directly related to the issues in the custody modification case." She alleged that the court had a duty to disclose "its receipt and consideration of extra evidence presented outside of trial" and that the court's failure to do so deprived her of due process. Melissa asked the court to vacate the June 2 order and recuse itself "from presiding over this case."

A copy of the girlfriend's petition and affidavit for a harassment protection order was attached to Melissa's motion to vacate. In the girlfriend's affidavit, she alleged multiple specific instances of rude and aggressive behavior by Melissa, occurring generally between July 2015 and May 2017. A copy of the district court's order dismissing the petition without a hearing was also attached to Melissa's motion. In the order, the court stated that the actions of Melissa, "while clearly inappropriate," did not meet the statutory requirements for issuance of a harassment protection order.

On June 30, 2017, approximately a minute after filing her motion to vacate, Melissa filed a notice of appeal, giving notice of her intent to appeal the district court's order of June 2.

A hearing on Melissa's motion to vacate was held on August 18, 2017, and the district court received an affidavit from Melissa concerning the allegations in her motion. The court also took judicial notice of the motion to vacate and the notice of appeal and related praecipes for transcript and bill of exceptions, which were marked and included in the supplemental bill of exceptions filed in this case. In Melissa's affidavit, she stated that she learned "weeks after" the modification trial that John's girlfriend had filed the application and affidavit for a harassment protection order against her, that she was not served with anything in connection with the

application, and that she had no knowledge "formally or informally" of the application filed just before the modification trial. Melissa further stated that she did not learn of the application until her attorney investigated certain inquiries made of Melissa by one of Melissa's clients on June 29, 2017. Melissa also stated that she subsequently reviewed the girlfriend's affidavit and the court's order denying the application, that several pieces of information provided by the girlfriend were false, that the court's notation about Melissa's behavior in its order denying the application indicated the court "accepted the [girlfriend's] information and judged [Melissa]." Finally, Melissa alleged that since she had no idea that the girlfriend "was putting this information before the Court," she had no way to defend herself.

On August 24, 2017, the district court entered an order, finding it did not have jurisdiction to hear Melissa's motion to vacate. The court considered Melissa's argument that it retained jurisdiction over her motion because she had filed it approximately 1 minute before filing her notice of appeal. The court concluded that the sequence in which the two pleadings were filed did not make a difference and found that it was divested of jurisdiction when Melissa filed her notice of appeal.

## ASSIGNMENTS OF ERROR

Melissa asserts that the district court (1) erred by receiving ex parte evidence related to the issues in this case, which prevented her from receiving a fair trial and a just and equitable result, and (2) abused its discretion by failing to find that she met her burden of demonstrating a material change in circumstances with respect to custody.

On cross-appeal, John asserts that the district court abused its discretion by failing to properly consider the improvement in Melissa's financial condition and refusing to modify or terminate her alimony award.

## STANDARD OF REVIEW

When a jurisdictional question does not involve a factual dispute, its determination is a matter of law, which requires an appellate court to reach a conclusion independent of the decision made by the lower court. *Tilson v. Tilson*, 299 Neb. 64, 907 N.W.2d 31 (2018).

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018).

## ANALYSIS

*Jurisdiction.*

Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *Tilson v. Tilson, supra*. Under Neb. Rev. Stat. § 25-1912 (Reissue 2016), to vest an appellate court with jurisdiction, a party must timely file a notice of appeal. *Clarke v. First Nat. Bank of Omaha*, 296 Neb. 632, 895 N.W.2d 284

(2017). Under § 25-1912(3), filing a timely postjudgment motion terminates the time in which a notice of appeal must be filed; instead, the 30-day period to appeal starts anew upon the entry of the order ruling upon the postjudgment motion. *Clarke v. First Nat. Bank of Omaha, supra*. Under § 25-1912, to determine if a notice of appeal filed before the court has entered an order or judgment on a postjudgment motion is effective, an appellate court must answer two questions: (1) Was the postjudgment motion timely and effective? (2) Was the notice of appeal filed after the court announced its decision or order on the postjudgment motion? *Clarke v. First Nat. Bank of Omaha, supra*. When a motion terminating the 30-day appeal period is filed, a notice of appeal filed before the court announces its decision upon the terminating motion has no effect and an appellate court acquires no jurisdiction. *State v. Bellamy*, 264 Neb. 784, 652 N.W.2d 86 (2002). See § 25-1912(3). An appellate court reviews a postjudgment motion based on the relief it seeks, rather than its title. *Clarke v. First Nat. Bank of Omaha, supra*.

"A new trial is a reexamination in the same court of an issue of fact after a verdict by a jury, report of a referee, or a trial and decision by the court." Neb. Rev. Stat. § 25-1142 (Reissue 2016). "A motion for a new trial shall be filed no later than ten days after the entry of the judgment." Neb. Rev. Stat. § 25-1144.01 (Reissue 2016). A timely motion for new trial terminates the running of the time for filing a notice of appeal, giving the party 30 days from the entry of the order denying the motion to file a notice of appeal. *Lindsay Internat. Sales & Serv., v. Wegener*, 297 Neb. 788, 901 N.W.2d 278 (2017). An untimely motion for new trial is ineffectual, does not toll the time for perfection of an appeal, and does not extend or suspend the time limit for filing a notice of appeal. *Fitzgerald v. Fitzgerald*, 286 Neb. 96, 835 N.W.2d 44 (2013). A motion to vacate filed within 10 days of the order of dismissal is the equivalent of the filing of a motion for new trial. *Mason v. Cannon*, 246 Neb. 14, 516 N.W.2d 250 (1994).

Under Neb. Rev. Stat. § 25-1329 (Reissue 2016), if a postjudgment motion seeks a substantive alteration of the judgment--as opposed to the correction of clerical errors or relief wholly collateral to the judgment--a court may treat the motion as one to alter or amend the judgment. *Clarke v. First Nat. Bank of Omaha, supra*. In order to qualify for treatment as a motion to alter or amend a judgment, a motion must be filed no later than 10 days after the entry of judgment, as required under § 25-1329. *Weeder v. Central Comm. College*, 269 Neb. 114, 691 N.W.2d 508 (2005). In cases involving a motion to alter or amend the judgment, a critical factor is whether the motion was filed within 10 days of the final order, because a timely motion tolls the time for filing a notice of appeal. *Fitzgerald v. Fitzgerald, supra*. Under § 25-1329, a motion for reconsideration is the functional equivalent of a motion to alter or amend a judgment. *Clarke v. First Nat. Bank of Omaha, supra*.

In a civil case, a court has inherent power to vacate or modify its own judgments at any time during the term at which those judgments are pronounced, and such power exists entirely independent of any statute. *In re Change of Name of Whilde*, 298 Neb. 510, 904 N.W.2d 707 (2017). In the absence of an applicable rule to the contrary, a motion asking the court to exercise its inherent power to vacate or modify its own judgment does not toll the time for taking an appeal. *Id.* A party can move the court to vacate or modify a final order, but if the court does not grant the motion, a notice of appeal must be filed within 30 days of the entry of the earlier final order if the

party intends to appeal it. *Id.* And if an appeal is perfected before the motion is ruled upon, the district court loses jurisdiction to act. *State v. Hausmann*, 277 Neb. 819, 765 N.W.2d 219 (2009).

Here, the district court's order ruling on the parties' requests to modify the decree was filed on June 2, 2017. Melissa filed her motion to vacate that order on June 30. Because her motion was filed more than 10 days after entry of the court's order, it was not effective as either a motion for new trial or a motion to alter or amend. Thus, her motion did not operate as a tolling motion. Melissa's notice of appeal, also filed on June 30, was timely and effective to divest the district court of jurisdiction. The district court correctly ruled that it did not have jurisdiction to hear her motion to vacate. See *id.* Because Melissa's notice of appeal was effective, this court acquired jurisdiction over her appeal.

*Ex Parte Evidence.*

Melissa asserts that the district court erred by receiving ex parte evidence related to the issues in this case. An ex parte communication occurs when a judge communicates with any person concerning a pending or impending proceeding without notice to an adverse party. *State v. Thomas*, 268 Neb. 570, 685 N.W.2d 69 (2004). Melissa does not argue that any ex parte communications occurred directly during the modification proceedings. Rather, she argues that the court's consideration of the girlfriend's petition and affidavit for a harassment protection order just prior to the modification trial amounted to the receipt and consideration of ex parte evidence related to the modification proceedings, which the trial judge had a duty to disclose. Although Melissa argues that the judge should have disclosed the fact that the protection order proceedings had occurred, her arguments are framed in terms of a denial of her due process rights. Essentially, Melissa argues that due to the court's consideration of information about her presented in the harassment protection order proceedings, the court was biased against her in the modification proceedings.

The concept of due process embodies the notion of fundamental fairness and defies precise definition. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). Generally, procedural due process requires parties whose rights are to be affected by a proceeding to be given timely notice, which is reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decisionmaker. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014). Melissa's arguments focus on the last factor; whether the trial judge was impartial in the modification trial.

As discussed above, the district court did not have jurisdiction to consider Melissa's motion to vacate. Because Melissa's arguments about the court's consideration of ex parte evidence in the modification proceedings ask us to evaluate issues not yet passed upon by the district court, we will not consider them in the present appeal. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *Walters v. Sporer*, 298 Neb. 536, 905 N.W.2d 70 (2017).

*Modification of Custody.*

Melissa asserts that the district court abused its discretion by failing to find that she met her burden of demonstrating a material change in circumstances with respect to custody.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id.* Next, the party seeking modification must prove that changing the child's custody is in the child's best interests.

A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). The party seeking modification of child custody bears the burden of showing a change in circumstances. *Id.*

Upon our de novo review of the record, we find no material change in circumstances affecting the best interests of the children that would warrant a modification of custody. First, with respect to Saige, Melissa concedes that Saige would be unlikely to comply with a change in her custody and that changing custody would not be in her best interest. The district court did not abuse its discretion in declining to modify the custody of Saige.

With regard to Hunter and Ethan, Melissa argues that a change in circumstances has occurred in that the amount of in-person contact and the relationship between her and each of the boys has changed since the decree. She points to the decreased actual parenting time with Hunter and Ethan's emotional phone calls as evidence of a material change in circumstances. However, in this court's previous opinion, we noted Hunter's "more defiant attitude" and Ethan's emotional neediness. See *Skalsky v. Skalsky*, No. A-15-973, 2016 WL 4529597 at *5 (Neb. App. Aug. 30, 2016) (selected for posting to court website). The evidence at the modification hearing shows that Hunter continues to be somewhat defiant with regard to spending time with Melissa, and Ethan continues to exhibit some emotional neediness surrounding the issue of parenting time. Also, Hunter's involvement in multiple extracurricular activities limits his time at home, whether with John or Melissa. Any changes related to his involvement in extracurricular activities was certainly within the court's contemplation at time of decree. Finally, the record shows that John and Melissa had a contentious relationship at the time of the divorce, and our review of the current record shows the same. Though as the district court noted, they have used text messaging effectively to communicate with respect to custody issues. Based upon our review of the record, we conclude that Melissa has failed to show a material change in circumstances since the entry of the decree. As the record does not show a material change in circumstances, the district court did not abuse its discretion declining to modify custody. Melissa's assignment of error is without merit.

*Modification of Alimony.*

On cross-appeal, John asserts that the district court abused its discretion by failing to properly consider the improvement in in Melissa's financial condition and refusing to modify or terminate her alimony award.

Pursuant to Neb. Rev. Stat. § 42-365 (Reissue 2016), alimony orders may be modified or revoked for good cause shown. *Metcalf v. Metcalf*, 278 Neb. 258, 769 N.W.2d 386 (2009). Good cause means a material and substantial change in circumstances and depends upon the circumstances of each case. *Id.* Good cause is demonstrated by a material change in circumstances, but any changes in circumstances which were within the contemplation of the parties at the time of the decree, or that were accomplished by the mere passage of time, do not justify a change or modification of an alimony order. *Id.* The moving party has the burden of demonstrating a material and substantial change in circumstances which would justify the modification of an alimony award. *Id.*

To determine whether there has been a material and substantial change in circumstances warranting modification of a divorce decree, a trial court should compare the financial circumstances of the parties at the time of the divorce decree, or last modification of the decree, with their circumstances at the time the modification at issue was sought. *Id.* Cohabitation, together with a showing that such arrangement improved a former spouse's overall financial condition, might warrant a modification of spousal support. *Onstot v. Onstot*, 298 Neb. 897, 906 N.W.2d 300 (2018).

In declining to modify alimony, the district court observed that since the divorce was entered, Melissa has continued to work at the same job and has not had an increase in her income or earning capacity. The court observed that while Melissa's cohabitation with her boyfriend allowed her to maintain a higher living standard than would be possible if paying all of her own expenses, her earned income had not increased and was not sufficient to cover her living expenses. The court's observations are consistent with our de novo review of the record. We agree with the court's conclusion that John did not establish a material change in circumstances since the divorce decree that would justify reducing or terminating the award of alimony to Melissa. Melissa testified that she still needed the additional income she receives from alimony to meet her living expenses. The court did not abuse its discretion in declining to modify or revoke the alimony award in this case.

## CONCLUSION

The district court correctly ruled that it did not have jurisdiction to hear Melissa's motion to vacate, and we decline to address Melissa's arguments concerning the receipt of ex parte evidence in the present modification proceedings because her arguments ask us to evaluate issues not yet passed upon by the district court. The district court did not abuse its discretion declining to modify custody or modify or terminate alimony.

AFFIRMED.